**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

    v.

BRANDON DEMARLO MONGHUR,
           *Defendant-Appellant.*

No. 08-10351

D.C. No.
2:07-cr-00118-PMP-
LRL

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
May 4, 2009—San Francisco, California

Filed August 11, 2009

Before: Procter Hug, Jr., Michael Daly Hawkins, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

10875

## COUNSEL

Jason F. Carr (argued), Assistant Federal Public Defender, Franny A. Forsman, Federal Public Defender, Las Vegas, Nevada, for defendant-appellant Brandon Monghur.

Robert L. Ellman (argued), Assistant United States Attorney, Gregory A. Brower, United States Attorney, Las Vegas, Nevada, for plaintiff-appellee United States of America

---

## OPINION

TALLMAN, Circuit Judge:

Brandon Monghur appeals the district court's denial of his suppression motion, following which he entered a conditional guilty plea to being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). In denying the motion, the district court concluded that Monghur waived his expectation of privacy in the closed container within which federal law enforcement discovered the revolver in question. We must decide whether the container search, conducted without a warrant, violated the Fourth Amendment's prohibition of unreasonable searches and seizures.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and conclude that the search was unlawful. We therefore vacate the conviction and the order denying suppression and remand for further proceedings.

## I

On May 9, 2007, Brandon Monghur, a previously convicted felon, was arrested pursuant to a state warrant for attempted murder and the battery of Antoinette Wilson.[1] Monghur was detained in a segregated cell at Nevada's Clark County Detention Center ("CCDC"). The CCDC has a telephone system that allows inmates to make outbound calls. Next to each telephone is a placard instructing them how to place calls and cautioning that inmate calls are subject to

---

[1]Wilson is the mother of Monghur's children, all of whom live in Wilson's apartment, which is the residence where the search was conducted.

monitoring and recording. A similar auditory warning is also issued to the recipient of each outbound call.

On the day of his arrest, Monghur made several telephone calls from the jail, including three calls to a person named Prince Bousley. In the first call, Bousley asked Monghur if he had been caught with "the thing." Monghur confirmed that he had not, and that "the thing" was hidden in Wilson's apartment, where he stayed "on and off for several months." In the second call, Bousley inquired whether Monghur wanted him to retrieve "the thing" from Wilson's residence. Monghur agreed and told Bousley to come to the CCDC and pick up the key to Wilson's apartment. During the third and final telephone call, Monghur told Bousley that he had put "the thing" in the closet in his room and that it was located "in the green."

FBI Special Agent Gary McCamey, who knew Monghur through an investigation into local gang activity, reviewed the telephone recordings on May 10, 2007. Although neither speaker specifically identified "the thing," Agent McCamey correctly surmised based on his experience and familiarity with "street vernacular" that Bousley and Monghur were referring to a firearm. At least six law enforcement officers immediately proceeded to Wilson's apartment and informed her that they had credible information that there was a handgun in her residence. Wilson, as she had done on a previous visit by officers, expressed no knowledge of any gun on the premises. She readily consented to a search and requested that any firearm found in the apartment be immediately removed out of concern for the safety of her five young children who lived there and were present at the time.[2] She led agents to her son's bedroom, which was the room in which Monghur slept when he stayed with Wilson.

---

[2]Wilson's eldest child was eight or nine years old at the time in question.

The agents proceeded to the bedroom closet, which contained clothing, shoes, and other items belonging to an adult male. On the shelf was an opaque green plastic storage container.[3] They removed the lid and found a .38 caliber revolver. The agents seized the handgun and removed it from the premises, as Wilson requested. At no point did the agents obtain, or attempt to obtain, a search warrant.

A federal grand jury returned an indictment charging Monghur with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and a related forfeiture count. Monghur moved to suppress the weapon. He argued that the warrantless search of the closed container violated his Fourth Amendment rights, requiring suppression of the fruits of the unlawful search. In response, the Government argued that (1) Wilson had authority to consent to the container search, (2) exigent circumstances justified the warrantless search, and (3) Monghur had no expectation of privacy in the container.

After holding an evidentiary hearing, a magistrate judge recommended denial of Monghur's motion. The magistrate rejected the Government's first two theories, finding that Wilson lacked both express and apparent authority to consent to the search of the container, and that exigent circumstances did not exist to excuse the warrant requirement. The Government does not challenge these rulings on appeal. The magistrate concluded, however, that Monghur relinquished any expectation of privacy with respect to the container, reasoning:

> During a phone call that he had reason to believe law enforcement officials were listening to, Monghur told Bousley he had hidden a handgun inside a green storage container in his bedroom closet. By his own voluntary act he knowingly assumed the risk that the

---

[3]The container had the name "Aaron" written on the side, but the record is unclear whether agents on the scene noticed this at the time.

police would learn where he was hiding his gun. By doing so, Monghur extinguished any reasonable expectation of privacy he might otherwise have had in the contents of the container.

The district court adopted the magistrate's findings in full over Monghur's objections and denied Monghur's suppression motion.

Monghur then pled guilty but, with the Government's consent, conditionally reserved the right to appeal the suppression order. He was sentenced to 96 months imprisonment, to be followed by three years of supervised release. Monghur timely appealed.

## II

We review *de novo* the district court's denial of a motion to suppress evidence. *United States v. Nance*, 962 F.2d 860, 862 (9th Cir. 1992). Factual findings are reviewed for clear error. *Id.*

## A

**[1]** "The Fourth Amendment is a vital safeguard of the right of the citizen to be free from unreasonable governmental intrusions into any area in which he has a reasonable expectation of privacy." *Winston v. Lee*, 470 U.S. 753, 767 (1985). As the parties agree, Monghur, at least initially, held a reasonable expectation of privacy in the closed container that he stored in the closet in Wilson's apartment. *See United States v. Davis*, 332 F.3d 1163, 1167 (9th Cir. 2003) ("'A person has an expectation of privacy in his or her private, closed containers' and 'does not forfeit that expectation of privacy merely because the container is located in a place that is not controlled exclusively by the container's owner.'" (quoting *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998))). The only question raised by this appeal is whether Monghur

relinquished, abandoned, or otherwise waived that expectation of privacy by disclosing the handgun's existence and location in jail telephone conversations that he knew were monitored by law enforcement.[4]

Relying on the general principle that "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection," *Katz v. United States*, 389 U.S. 347, 351 (1967), the Government contends that "[b]y making statements to [Bousley], knowing that jailors were listening, [Monghur] disavowed his expectation of privacy in the container, not merely the words he uttered over the telephone." Br. of Appellee at 15. The district court seems to have accepted the Government's analysis. We disagree.

**[2]** The Government's position on appeal, to a large extent, conflates two separate inquiries. Much of its briefing focuses on the reasonableness of Monghur's expectation of privacy in his jail telephone conversations. But Monghur concedes, as he must, that he had no expectation of privacy in those calls. *See United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir. 1996) ("[A]ny expectation of privacy in outbound calls from prison is not objectively reasonable and . . . the Fourth Amendment is therefore not triggered by the routine taping of such calls."). The Government attempts to extrapolate from the undisputed lack of an expectation of privacy in the jail telephone calls to equally apply to the closed container. We are not persuaded. Whether Monghur had a constitutionally protected expectation of privacy in a closed container stored in Wilson's apartment—given his admissions made during telephone conversations with Bousley—is a distinct constitutional question.

**[3]** We have not squarely addressed what effect, if any, a

---

[4]The Government's only argument on appeal relates to Monghur's expectation of privacy in the closed container. Therefore, we do not address the exigency or consent arguments presented to, and rejected by, the district court.

voluntary disclosure might have on a Fourth Amendment analysis in this context. *See United States v. Gust*, 405 F.3d 797, 804 n.14 (9th Cir. 2005) ("We express no opinion whether Gust's pre-search admissions to the police that the cases contained guns should be relevant to determining whether Gust retained any expectation of privacy in the gun case, as neither party raised this issue on appeal."). The Seventh Circuit addressed a similar question in *United States v. Cardona-Rivera*, 904 F.2d 1149 (7th Cir. 1990). Officers arrested a defendant in possession of two conspicuously wrapped packages that they believed were bricks of cocaine. The officers inquired as to the contents, to which the defendant responded, "coke." *Id.* at 1152. The officers then took the packages to the federal building where, without a warrant, they opened them and found cocaine. *Id.*

**[4]** On appeal from the denial of a suppression motion the Seventh Circuit held that officers were not required to obtain a warrant before searching the packages, despite ample time to do so, because the defendant had voluntarily and contemporaneously disclosed to the officers that they contained contraband. *Id.* at 1156. The court concluded that the defendant had waived any expectation of privacy in the packages' contents, thus obviating the warrant requirement:

> [H]ere the waiver of privacy was direct and explicit. Asked what the packages contained, Luna said "coke" (he denied this at the suppression hearing, but the judge disbelieved him). He stripped the cloak of secrecy from the package. It was as if he had unwrapped it and pointed. Once Luna admitted that his package contained a contraband substance, no lawful interest of his could be invaded by the officers' opening the packages, whether on the spot or later in their office. No purpose would be served by insisting on a warrant in such a case or by setting aside the conviction because of the absence of a warrant.

*Id.*; *see also* Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 5.5 (4th ed. 2004) ("[T]he act of stating to police the contents of the container is much like revealing the contents by using a transparent container.").[5]

[5] We think the Seventh Circuit's reasoning in *Cardona-Rivera* makes perfect sense. When made to a law enforcement officer, an unequivocal, contemporaneous, and voluntary disclosure that a package or container contains contraband waives any reasonable expectation of privacy in the contents. *See Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (recognizing that "reasonableness" remains the touchstone under the Fourth Amendment). The Constitution does not require the formality of a warrant in such circumstances.

[6] The facts of this case are, however, sufficiently distinguishable from *Cardona-Rivera* that the logical underpinnings of the principle announced there find no parallel in the instant case. Cognizant that jail personnel might be listening, Monghur attempted to disguise the subject matter by using ambiguous, generic language to describe the handgun and its whereabouts: "the thing" was in a closet, "in the green." It is relevant that Monghur never explicitly identified the contraband at issue. Although Agent McCamey had his reasoned suspicions, "the thing," viewed in context, could have been a number of things, including contraband.[6] Nor did Monghur

---

[5]Some state courts have adopted similar holdings. *See Commonwealth v. Kondash*, 808 A.2d 943, 949 (Pa. Super. Ct. 2002) (holding that the defendant's admission revealing that his closed pouch contained needles was a relinquishment of any expectation of privacy he had therein and, therefore, no constitutional violation associated with its warrantless search occurred); *People v. Carper*, 876 P.2d 582, 584-85 (Colo. 1994) (holding that, by disclosing to an agent that he was carrying a bindle inside his pocket that contained cocaine, the defendant "did not manifest a subjective privacy interest in the contents of his pocket or of the bindle"); *State v. Ludtke*, 306 N.W.2d 111, 114 (Minn. 1981) ("[The] defendant, by volunteering what the contents were, had implicitly signaled that he no longer had any expectation of privacy in the satchel.").

[6]We do not suggest that police officers cannot rely on their training, experience, or familiarity with street jargon to interpret coded phrases. But

specifically identify the container itself. Indeed, at the suppression hearing, Agent McCamey testified that based on the conversations he did not know that he was looking for a green plastic container when agents went to Wilson's apartment. Perhaps most significantly, coded language aside, Monghur never made a voluntary disclosure directly to law enforcement. He was informing an associate where to find his gun in the hope that it could be removed before its discovery. That Monghur acted covertly knowing that calls were monitored or recorded—and that law enforcement might review the conversations—is materially different from directly and intentionally admitting to a police officer the contraband contents of a specific package or closed container.

Nothing about his jailhouse conversations with Bousley, which law enforcement later overheard, operates as a "direct and explicit" waiver of an expectation of privacy in a container hidden elsewhere. *Cardona-Rivera*, 904 F.2d at 1156. Monghur's efforts to conceal the subject matter based on what he said on the phone demonstrate both an objective and subjective intention to preserve privacy—not to relinquish it. We therefore reject the Government's position that Monghur waived his expectation of privacy in the closed container through his statements on the telephone.

[7] To be clear, we think based on his admissions in the jail telephone conversations, coupled with Monghur's criminal record for violence and what officers discovered when Wilson invited them to look around, Agent McCamey had probable cause to believe Monghur had a firearm stashed inside Wilson's apartment. Exigency was not established here and is unchallenged on appeal. Therefore, we must presume that,

the fact that a coded phrase was used in the monitored telephone conversations is relevant in assessing whether Monghur, through his actions, relinquished his expectation of privacy in the contents of a closed container located elsewhere.

after discovering Monghur's possessions in the closet and identifying the green plastic container (i.e., what they reasonably believed was "the green"), agents could have sealed the apartment and presented their observations from the investigation, Monghur's known criminal history, and Monghur's conversations with Bousley to a neutral and detached magistrate to support a warrant application. But, we find no basis to conclude that Monghur waived his expectation of privacy in the closed container because he made an encrypted, incriminating disclosure that he was warned would be reviewed by law enforcement. Accordingly, the agents' search of his closed container without a warrant violated Monghur's Fourth Amendment rights.

## B

The application of the exclusionary rule deserves brief mention. While this appeal was pending, the Supreme Court decided *Herring v. United States*, 129 S. Ct. 695 (2009), which confirmed that "suppression is not an automatic consequence of a Fourth Amendment violation." *Id.* at 698; *see also Hudson v. Michigan*, 547 U.S. 586, 591 (2006) ("Suppression of evidence . . . has always been our last resort, not our first impulse."). The Court reaffirmed that, before applying the exclusionary rule, courts should examine whether the benefits of deterring police misconduct outweigh the "substantial social costs" of applying the rule, which include the principal concern of "letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.' " *Herring*, 129 S. Ct. at 701 (quoting *United States v. Leon*, 468 U.S. 897, 908 (1984)). Chief Justice Roberts, writing for the majority, explained:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule

serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Id.* at 702. By contrast, because "[a]n error that arises from nonrecurring and attenuated negligence is . . . far removed from the core concerns that led us to adopt the rule in the first place," *id.*, "when police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way,' " *id.* at 704 (quoting *Leon*, 468 U.S. at 907-08). *See also United States v. Noster*, No. 07-50391, 2009 WL 2032347, at *3-4 (9th Cir. July 15, 2009); *United States v. Al Nasser*, 555 F.3d 722, 726 (9th Cir. 2009).

**[8]** Here, having concluded that the warrantless search was lawful, the district court never reached the question of suppression. In light of "the general rule . . . that a federal appellate court does not consider an issue not passed upon below," remand is appropriate to allow the district court, which is in a superior position to assess the deliberateness and culpability of the officers' conduct, to apply *Herring* in the first instance. *See Singleton v. Wuff*, 428 U.S. 106, 120 (1976).

## III

The warrantless search of the closed container stored in Wilson's apartment, though supported by probable cause, was unlawful and violated Monghur's Fourth Amendment protection against unreasonable searches and seizures. For the foregoing reasons, we VACATE the conviction and the order denying Monghur's suppression motion and REMAND to the district court to consider whether suppression is the appropriate remedy in light of *Herring*.

**VACATED AND REMANDED.**