**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

v.

SONG JA CHA; IN HAN CHA,
  *Defendants-Appellees.*

No. 09-10147

D.C. No.
1:08-cr-00008-DDP
(JVEM)

OPINION

Appeal from the United States District Court
for the District of Guam
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
October 14, 2009—Honolulu, Hawaii

Filed March 9, 2010

Before: Robert R. Beezer, Susan P. Graber and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Beezer

## COUNSEL

Lisa J. Stark, United States Department of Justice, Washington, D.C., for the plaintiff-appellant.

G. Patrick Civille, Civille & Tang, PLLC, Hagåtña, Guam; Howard Trapp, Howard Trapp Inc., Hagåtña, Guam, for the defendants-appellees.

## OPINION

BEEZER, Circuit Judge:

Song Ja Cha ("Ms. Cha") and In Han Cha ("Mr. Cha") were charged with the federal crimes of conspiracy, sex trafficking and coercion, and enticement to travel for the purpose of prostitution in violation of 18 U.S.C. §§ 2, 371, 1591(a), 1594, and 2242. In the pretrial hearing before the magistrate judge, the Chas moved to suppress evidence that had been seized pursuant to a warrant at their house and adjoining business, the Blue House Lounge. The magistrate judge concluded that, although the police had probable cause to seize these premises while they obtained a warrant, the warrantless seizure was unreasonably long in violation of the Fourth Amendment to the U.S. Constitution. The district court agreed with the magistrate judge's conclusions, and the United States brought an interlocutory appeal to this court. We conclude that the seizure of the Cha residence, which lasted a minimum of 26.5 hours, was constitutionally unreasonable and that suppression of the evidence was warranted. We therefore affirm.

I

It was Saturday evening, January 12, 2008, in Tamuning, Guam, when Officers Manibusan and Laxamana pulled into the parking lot of the Blue House Lounge karaoke bar to investigate a report they had received earlier that evening. Sonina Suwain ("Ms. Suwain"), who was from Chuuk, had reported that the owner of the Blue House Lounge, Ms. Cha, had Ms. Suwain's passport and was refusing to return it. When the officers arrived at the Blue House Lounge, Ms.

Suwain told the officers that two of her cousins from Chuuk, Cindy and Vivian,[1] were being held inside the Blue House Lounge against their will.

Officer Manibusan sent Officer Tan, who had just arrived with several other officers, into the Blue House Lounge to find Cindy and Vivian so he could determine whether they were there "on their own free will." When Officer Tan entered the lounge, the karaoke machine was playing and customers were drinking at the bar. He found Cindy waiting tables. Officer Tan asked the bartender where he could find Vivian, and the bartender pointed to several numbered doors in the back of the restaurant. Officer Tan recognized these rooms as "comfort rooms," which are fairly common in karaoke bars in Guam. In these rooms, customers "can buy drinks and take the waitress into the room and watch TV or sing songs or just chat." Officer Tan heard a woman's voice coming from one of the comfort rooms and knocked on the door. Vivian emerged looking disheveled, and a man stood hiding behind the door with his pants "barely on"—unzipped, unbuttoned, and unbuckled.

Once Officer Tan and the two women were outside, the women, crying, reported that they were being prostituted against their will. They maintained that Ms. Cha kept their passports and that if they refused to have sex with a customer, Ms. Cha would refuse to feed them that night. Hearing this, Officer Manibusan ordered Ms. Cha to close up for the evening even though the bar would normally stay open much later. The officers interviewed each customer before the customer left the bar.

After all the customers left the establishment, Officer Manibusan asked Ms. Cha to give him and a few other officers a "tour." Other officers completed a detailed "scene

---

[1] It was later determined that "Cindy" and "Vivian" were pseudonyms. Cindy's real name is Simirina Samuel, and Vivian's is Daileen Robert.

check." The officers' tour extended into the Chas' residence, which was connected to the Blue House Lounge by a hidden door. There, the officers found Mr. Cha asleep. They woke him and forced him outside.

With the "scene check" complete, Officer Manibusan instructed the Chas to lock up. Mr. Cha did so and kept the keys. All of the officers drove away, while the Chas escorted the women in their car down to the police station. It was 1 a.m. Sunday morning.

The officers interviewed the women throughout the night. Ms. Cha was not allowed to leave the precinct and was ultimately arrested at 6 a.m. Mr. Cha, however, remained free throughout, leaving at least once to get Ms. Cha some food.

At about 8 a.m., Mr. Cha returned home to find a police officer outside, guarding the house. He called his lawyer, Mr. Van de veld, anxiously recounted the night's events and told Mr. Van de veld that "the police were still there and would not allow him access to the premises." Mr. Van de veld told Mr. Cha that he would stop by as soon as he finished his golf game.

Around 12:45 p.m., Mr. Van de veld, with his golf buddies in tow, arrived at the Cha residence. The officers informed him that the Blue House Lounge and the Cha residence had been "detained" since around midnight and that no one was allowed to enter the premises. Mr. Van de veld left to drive his friends home.

When Mr. Van de veld returned to the Blue House Lounge at 2:30 p.m., Mr. Cha was still waiting outside. Mr. Van de veld was concerned about Mr. Cha's health because, earlier that afternoon, Mr. Cha looked "pale and was perspiring heavily." Knowing that Mr. Cha had diabetes, Mr. Van de veld asked if the police would allow Mr. Cha to find his insulin and glucose monitor inside the house. The police refused.

It was four hours later, at 7 p.m., when an officer finally accompanied Mr. Cha into the house to get his medicine. Afterward, Mr. Cha and Mr. Van de veld waited outside Mr. Cha's house until 1 a.m. Monday morning when Mr. Van de veld went home to get some sleep. The record does not reveal where Mr. Cha slept while his house was "detained" through the night.

While Mr. Cha had been waiting outside his house all Sunday, the police had been back at the precinct preparing the warrant application. At about 9:20 Sunday morning, Officer Perez, who had not previously been involved in the case, received a call from his supervisor and was told to come into the office at noon for a briefing. At the briefing, Officer Perez was tasked with preparing the warrant application. But it was not until six-and-a-half hours later that he actually began work on the application; he wanted to wait to receive and review all the police reports first.

So, while more interviews were conducted and the investigation continued, Officer Perez changed the caption on the warrant application and updated his background information. He "urgently" worked from 6:30 to 9:15 p.m. Sunday to finish the application because, under a Guam ordinance, there was a presumption against searches conducted after 10 p.m. But when he found that he could not meet the 10 p.m. deadline, he worked until 4 a.m. to finish the warrant application. And, after he returned to work at 7:50 a.m. on Monday morning, Officer Perez brought the application to the Chief Prosecutor, who had made an unusual request to review the warrant application. Officer Perez then unsuccessfully searched for a magistrate judge throughout the morning. He finally found a magistrate judge to issue the warrant at 10:25 a.m. Monday.

Even with the warrant in hand, the police did nothing with the warrant for almost three hours. It was 1:15 p.m. when Officer Perez finally called Mr. Cha's lawyer and told him that the search would be conducted at 2 p.m.—which hap-

pened to coincide with Ms. Cha's 2 p.m. arraignment. Mr. Van de veld requested that the police wait until after the arraignment to begin the search, but the police refused. By the time that Mr. Cha and Mr. Van de veld returned from the courthouse, the police had already began the search at the Blue House Lounge and Cha residence. The search concluded at 1 a.m. Tuesday, when Mr. Cha was finally allowed back into his house. An arrest warrant issued for Mr. Cha a few weeks later, on February 7, 2008.

In a pretrial hearing, the Chas moved to suppress the evidence seized at their house and the Blue House Lounge. The magistrate judge recommended and the district court concluded that the warrantless seizure of the Cha residence was unconstitutionally long. The district court ordered the evidence suppressed.

## II

The United States appeals the suppression of the evidence pursuant to 18 U.S.C. § 3731, certifying that the evidence suppressed constituted substantial proof of material fact in the proceeding. We thus have interlocutory appellate jurisdiction pursuant to that statute. We review de novo the district court's decision to suppress the evidence, and we review its factual findings supporting that decision for clear error. *See United States v. Jones*, 286 F.3d 1146, 1150 (9th Cir. 2002).

## III

**[1]** It is undisputed that the police officers had probable cause and that the officers were allowed to seize the Blue House Lounge and Cha residence for a reasonable time while they obtained a warrant. "Of course, a seizure reasonable at its inception . . . may become unreasonable as a result of its duration or for other reasons." *Segura v. United States*, 468 U.S. 796, 812 (1984) (plurality opinion). Neither the Supreme Court nor this Circuit has identified when a warrantless sei-

zure of a residence becomes unconstitutionally long. Here, the police seized the Cha house for at least 26.5 hours—from 8 a.m. on Sunday, January 13, 2008 to 10:25 a.m. on Monday, January 14, 2008.[2] Under the circumstances of this case, the duration of this seizure was too long under the Fourth Amendment.

**[2]** The Supreme Court in *Illinois v. McArthur* set forth the relevant test for determining the reasonableness of a seizure of a residence. 531 U.S. 326 (2001). Under this test, we are to "balance the privacy-related and law enforcement-related concerns" using four factors: (1) whether the police had probable cause to believe that the defendant's residence contained evidence of a crime or contraband; (2) whether "the police had good reason to fear that, unless restrained," the defendant would destroy the evidence or contraband before the police could return with a warrant; (3) whether "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; and (4) whether "the police imposed the restraint for a limited period of time"—in other words, whether the "time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id.* at 331-32.

**[3]** Because the police officers had probable cause, the first factor favors the government. But the other three factors favor

---

[2]The parties have argued at length regarding when the seizure occurred. The Chas argued that the premises were seized at 1:30 a.m. Sunday, and the government initially argued that the seizure did not occur until 9:22 a.m. In its brief and at oral argument, the government essentially conceded that the seizure occurred at 8 a.m. *See* Appellant's Br. at 25 (noting that the police did not restrict access to the Blue House Lounge "until an officer was posted on the premises—no earlier than 8:00 a.m. Sunday"). The district court adopted the Chas' argument that the seizure occurred at 1:30 a.m. Sunday. We need not decide whether the premises were seized at 1:30 a.m., however. Even if the premises were seized at 8 a.m. as the government argues, the seizure would have lasted 26.5 hours. As discussed, we hold that this length of time is constitutionally unreasonable.

the Chas. The district court's finding under the second factor that the government did not have good reason to fear that Mr. Cha would destroy evidence is not clearly erroneous.

**[4]** The third factor weighs in favor of the Chas because the government did not make "reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy." *Id.* at 332. In *McArthur*, the Supreme Court concluded that the third factor weighed against the defendant in part because the officers allowed the defendant to enter his trailer home accompanied by an officer whenever he wished. *Id.* But the police did not allow Mr. Cha to enter his residence even with police accompaniment for 11 hours after he sought permission to enter his house and more than four hours after the police were informed that Mr. Cha needed medicine for his diabetes.

**[5]** Under the fourth factor, the duration of the seizure in this case was much longer than in *McArthur*—at least 26.5 hours instead of only two. And although the United States argues that the police officers "were extraordinarily diligent and worked tirelessly around the clock in their pursuit of a search warrant," Appellant's Br. at 33, the *McArthur* test asks only how long was reasonably *necessary* for police, acting with diligence, to obtain the warrant. Here, even if the police officers acted diligently during the seizure interviewing witnesses multiple times and drafting a meticulous warrant application, they took a much longer time than was reasonably necessary to obtain the warrant. The government already had probable cause by 1 a.m. Sunday. *See* Appellant's Br. at 4, 15. And the magistrate judge who authored the report and recommendation—a magistrate judge in Guam and familiar with warrant procedure there—admonished, "Police officers on Guam know that when exigent circumstances are present and there is an urgency to obtain a search warrant, a detached magistrate may be located at any hour to approve a warrant application."

*Segura v. United States* also supports the conclusion that the seizure here was unreasonable. In *Segura*, the Supreme Court concluded that a 19-hour warrantless seizure was reasonable under the circumstances. 468 U.S. at 798, 801. The two Justices to expound on the seizure's duration cited three reasons why the seizure was reasonable. They noted that the officers did not exploit the delay in obtaining the warrant, that only eight hours of the delay was during the hours of 10 a.m. to 10 p.m.—when they assumed judicial officers were not readily available—and that both the defendants who had possessory interests in the residence were under arrest or in the custody of the police during the entire occupation. *Id.* at 812-13 (plurality opinion).

**[6]** Here, although there was no evidence of bad faith, the delay was much longer: at least 26.5 hours instead of 19. Also, in *Segura*, the seizure occurred at night, and more than half of the delay occurred before 10 a.m. the next morning. *Id.* Here, however, the seizure occurred in the morning, and the officers had all day Sunday to obtain the warrant before the late-night-hour of 10 p.m.[3] Also contrary to the assumption in *Segura*, a judicial officer was available to the police even at night. And, unlike the defendants in *Segura*, Mr. Cha was not

---

[3]The two Justices to reach the question in *Segura* noted that "more than half of the 19-hour delay was between 10 p.m. and 10 a.m. the following day." *Segura*, 468 U.S. at 812-13 (plurality opinion). Because the apartment in *Segura* was seized at about 11:15 p.m. and the warrant was issued at 6 p.m. the following day, there were eight hours between 10 a.m. and 10 p.m. The United States, here, attempts to argue that more than half of the delay in this case was *also* at night. *See* Appellant's Br. at 29, 33. This analogy verges on the nonsensical. In any delay longer than a day, roughly half of the time will *always* be between 10 p.m. and 10 a.m. Thus, it makes more sense to read the Justices' statement as pointing out the absolute numbers of non-late-night hours available to the police and not the relative number of hours available. Here, the seizure took place at least between 8 a.m. on Sunday and 10:25 a.m. on Monday. Thus, 12.5 hours were between the hours of 10 a.m and 10 p.m. Moreover, assuming that the seizure began at 8 a.m. Sunday morning, the initial seizure occurred during daylight hours.

under arrest or in the custody of the police but rather sought entry to his residence. His possessory interests were therefore quite strong instead of "virtually nonexistent." *Id.* at 813.**⁴** In light of the Supreme Court's discussion of the two-hour seizure in *McArthur* and the two Justices' discussion of the 19-hour seizure in *Segura*, Supreme Court precedent strongly suggests that the length of the seizure at issue in this case was unreasonable.**⁵**

**[7]** Ninth Circuit precedent also supports our conclusion that the seizure was unreasonable. In *United States v. Holzman*, applying the *Segura* test, we concluded that the 13-hour seizure of a hotel room was reasonable. 871 F.2d 1496, 1507-08 (9th Cir. 1989), *overruled on other grounds by Horton v. California*, 496 U.S. 128 (1990). The facts in this case that distinguish *Segura* also distinguish *Holzman*. The seizure here was much longer than the 13-hour seizure in *Holzman*. The *Holzman* seizure took place at midnight, and the search was conducted that same afternoon at 1 p.m. And the defendants were both under arrest in *Holzman*, whereas Mr. Cha was not under arrest. *See id.* at 1499.

Cases that have allowed the seizure of packages for a longer period of time than involved here do not cast doubt on our decision. *See, e.g.*, *United States v. Van Leeuwen*, 397 U.S. 249, 253 (1970) (holding that seizure of package of stolen

---

**⁴**As the magistrate judge noted, this factor applies differently to Ms. Cha because she was under arrest during the entire period, but the overall analysis under *McArthur* and *Segura* would make the seizure unreasonable as to Ms. Cha as well.

**⁵**The United States relies heavily on a Guam Ordinance that provides a presumption against searches between the hours of 10 p.m. and 6 a.m. *See* Guam Code Ann. tit. 8, § 35.20(c). The government delayed much longer than this time frame, however. Additionally, this section provides that warrants cannot be executed between 10 p.m. and 6 a.m. "unless the court, by appropriate provision in the warrant and for reasonable cause shown, authorizes its execution [during these hours]." In view of this exception, too, the United States' reliance on this section is misplaced.

coins for 29 hours was reasonable); *United States v. Gill*, 280 F.3d 923, 929 (9th Cir. 2002) (holding that six-day delay of package was reasonable). That a package may be seized for a longer period of time than a residence is logical given the heightened constitutional protection "preserving the privacy and sanctity of the home." *Payton v. New York*, 445 U.S. 573, 588 (1980); *see id.* at 585, 589. "[A] man's house is his castle," *id.* at 596, 598, whether it is under siege by police officers prying into his possessions stored within or whether they exclude him from its sanctuary.

The poignant facts of this case demonstrate why Fourth Amendment possessory and privacy interests are greatly affected by the seizure of a dwelling. Mr. Cha was rendered homeless for the duration of the seizure. When he left his wife at the police station at 8 a.m., he went home only to find that he was barred from entering. He then waited outside his house for most of the day until 7 p.m. when an officer finally accompanied him to retrieve his diabetes medicine. He then waited outside his residence until at least 1 a.m. The next day he waited outside as well, only to travel to his wife's arraignment. The search began at 2 p.m., and he helped the officers during the search that lasted until 1 a.m. Tuesday morning. Only then was he allowed to return to his house—nearly 48 hours after being excluded.[6]

---

[6]The United States also cites *Dixon v. Wallowa County* to argue that we have recognized a "crime scene exception" to the warrantless seizure rule that would allow for warrantless seizures of unlimited duration. *See* Appellant's Br. at 41 (citing *Dixon v. Wallowa County*, 336 F.3d 1013 (9th Cir. 2003)). We did not address the reasonableness of the seizure's duration in *Dixon*. But more importantly, there is no "crime scene exception" to the Fourth Amendment. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586. With probable cause, the police may seize a residence for a reasonable period of time to prevent the destruction of evidence while a warrant is obtained. *See McArthur*, 531 U.S. at 337. The Fourth Amendment makes no further distinction between a house and a "crime scene."

**[8]** Under *Segura*, *McArthur*, and *Holzman*, we conclude that the 26.5-hour warrantless seizure of the Cha residence was unreasonable.

IV

The United States argues that even if the seizure of the Cha residence was unreasonable, the evidence seized pursuant to the delayed warrant should not be suppressed because the evidence was not the "fruit" of the unreasonable seizure. *See* Appellant's Br. at 19-23.[7] We agree that the fruit of the poisonous tree doctrine does not apply, but we hold the evidence must be suppressed in this case as a direct result of the Fourth Amendment violation.

**[9]** It is clear that the evidence cannot be excluded as "fruit" of the unreasonable seizure because the evidence was not the "product" of the illegality and because the warrant provided an "independent source" for the information.

**[10]** Here, the evidence was not the "product" of the unconstitutional action because the unconstitutional seizure was not the "but for" cause of the discovery of the evidence. *See, e.g.*, *Segura*, 468 U.S. at 815; *United States v. Ankeny*,

---

[7]The Chas argue that the government has waived this argument because the government raised it for the first time in its objections to the magistrate judge's report and recommendations. A district judge has discretion to consider new evidence or legal arguments made only in the objections to the magistrate judge's report, but "the district court must actually exercise its discretion, rather than summarily accepting or denying the motion." *Brown v. Roe*, 279 F.3d 742, 744 (9th Cir. 2002) (internal quotation marks omitted). Here, the district judge merely stated without elaboration that "[u]pon said [de novo] review, the court finds that the objections to the Magistrate Judge's Report and Recommendations are not well-taken." This boilerplate language is not enough. *See id.* at 745. With no decision to review for abuse of discretion, we conclude for ourselves that the argument should be considered because it involves a legal question and no further factual development is necessary. *See Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 888 n.4 (9th Cir. 2002).

502 F.3d 829, 836-38 (9th Cir. 2007) (not deciding whether the execution of the search warrant in an allegedly violent manner made the search unreasonable because the evidence would have been discovered whether violence was used or not). Because the police officers initially had probable cause, it is irrelevant how long they seized the Cha residence because the length of the seizure outside the house could never lead to the discovery of the evidence.

In a similar vein, because the Chas do not argue the initial entry and "scene check" of their residence was unconstitutional, the witnesses' testimony derived from this entry provided sufficient probable cause for the warrant. The warrant thus provided an independent source for the evidence, dissipating the taint from the unconstitutional action. *See, e.g.*, *United States v. Salas*, 879 F.2d 530, 536-39 (9th Cir. 1989) (holding sufficient evidence derived independently of, and prior to, unconstitutional entry rendered warrant valid and not tainted). Thus, the evidence was not excludable on the basis of the fruit of the poisonous tree doctrine.

V

**[11]** Our analysis does not end there, however. Although not excludable as fruit of the poisonous tree, the evidence must be suppressed as a direct result of the constitutional violation. *United States v. Dass* holds that the exclusionary rule is applicable to unreasonably long seizures. 849 F.2d 414, 414 (9th Cir. 1988). In that case, we specifically concluded that it is irrelevant whether the evidence is the "product" or "fruit" of the unconstitutional delay:

> [W]e reject the government's argument that it did not benefit from the delay. The police established probable cause at the moment of the dog sniff; therefore, it argues, the government's "constitutional position" did not change as the seizure continued. Such a contention undercuts two goals of the fourth

amendment—deterring unreasonable police behavior and judicial determination of probable cause. The government's theory would allow an unlimited period of seizure without judicial intervention; to accept its argument would nullify the seizure portion of the search and seizure clause of the fourth amendment. This we will not do.

*Id.* at 415-16 (citations omitted); *see United States v. Rodriguez*, 869 F.2d 479, 486 (9th Cir. 1989) ("So long as the 'seizure' of the premises was supported by probable cause, *and not otherwise unreasonable*, items subsequently seized under the valid warrant are not directly excludable." (emphasis added)). *McArthur* and *Segura* also assumed the evidence would have been excluded if the Court had concluded that the seizures were unreasonable. *See McArthur*, 531 U.S. at 329 (reversing the trial court's order granting suppression); *Segura*, 468 U.S. at 804 ("The only issue here is whether [the] drugs . . . should have been suppressed.").

Finally, the Supreme Court's recent decision, *Herring v. United States*, does not change our decision to affirm suppression of the evidence. 129 S. Ct. 695 (2009). In *Herring*, police officers arrested the defendant, relying on a warrant from another county. *Id.* at 698. Although the warrant appeared to be valid in the police database system, the warrant had been recalled five months earlier. *Id.* Because of a clerical error, the system had not been updated. *Id.* The defendant was indicted for possessing drugs and a pistol, which were found on his person when he was searched incident to his arrest under the invalid warrant. *Id.* at 698-99. The Supreme Court affirmed the district court's and Eleventh Circuit's decisions to admit the evidence. *Id.* at 699.

**[12]** The *Herring* Court explained that Supreme Court cases apply the exclusionary rule to "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* at 702. It concluded that because

the exclusionary rule is triggered only if police conduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system," *id.*, the marginal deterrence of excluding evidence that was the result of isolated, "nonrecurring and attenuated negligence" did not " 'pay its way,' " *id.* at 702, 704. The Court noted that it was "crucial to [its] holding" that the Eleventh Circuit concluded that the police error was merely negligent and that the "question presented treat[ed] the error as a 'negligen[t]' one." *Id.* at 700 & n.1.

Because *Herring* only applies to isolated police negligence, it does not bar suppression here because the police conduct was deliberate, culpable, and systemic.

The police conduct was sufficiently deliberate. The United States cites *Herring* and argues that application of the exclusionary rule is not justified in this case because "the police did not engage in intentional misconduct when they seized the premises." Appellant's Br. at 23. This argument misses the mark. *Herring* holds only that the conduct triggering application of the exclusionary rule cannot be merely *negligent* because it must be sufficiently deliberate that it can be deterred. *Herring*, 129 S. Ct. at 700 & n.1, 704. *Herring* emphasizes that the standard is "objective, not an 'inquiry into the subjective awareness of arresting officers.' " *Id.* at 703. The case applies the good-faith standard espoused in *United States v. Leon*—" 'whether a reasonably well trained officer would have known that the search [or seizure] was illegal.' " *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)); *see United States v. Gonzalez*, 578 F.3d 1130, 1132 (9th Cir. 2009) (noting that *Herring* employs *Leon*'s good faith standard).

*Herring*'s emphasis on an objective reasonableness standard is paramount here where the officers made a mistake of law, rather than a mistake of fact. In *Herring*, the police officers made a mistake of fact—whether an arrest warrant

existed for the defendant. Here, the officers made a mistake of law—they did not realize that a seizure must last "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *McArthur*, 531 U.S. at 332.

Our precedent distinguishes between mistakes of fact and mistakes of law because mistakes of law can be deterred more readily than mistakes of fact. In *United States v. Lopez-Soto*, we concluded that "there is no good-faith exception to the exclusionary rule for police who do not act in accordance with governing law." 205 F.3d 1101, 1106 (9th Cir. 2000). We emphasized that "[t]o create [such] an exception . . . would defeat the purpose of the exclusionary rule, for it would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey." *Id.*[8]

[13] The Guam police officers' deliberate conduct in this case demonstrates why mistakes of law can and should be deterred. Officer Perez testified that he was never taught at the police academy that " 'time was of the essence' once the police have secured a premises" or "that the police had to act with deliberate haste to obtain the warrant." *See McArthur*, 531 U.S. at 332. Indeed, the United States argues that "Officer Perez . . . did not know that he had a duty to diligently pursue the drafting and eventual approval of the warrant by a detached magistrate." Appellant's Br. at 23. The Guam police department's failure to know the governing law was reckless behavior; the police officers were a far stretch from *Leon*'s "reasonably well trained officer." In fact, the magistrate judge found that the officers involved should have known that when "there is an urgency to obtain a search warrant, a detached

---

[8]*Herring* did not discuss mistakes of law, and our cases holding that the good-faith exception does not apply to mistakes of law are still good law. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) (noting that prior circuit authority is still good law unless "clearly irreconcilable" with an intervening Supreme Court case).

magistrate may be located at any hour to approve a warrant application." It is clear that the police errors here were much more troubling than the negligence in *Herring*—the conduct was in reckless disregard of the Fourth Amendment's reasonable seizure requirement.

**[14]** The police conduct here was also "sufficiently culpable that . . . deterrence is worth the price paid by the justice system." *Herring*, 129 S. Ct. at 702. The police seized the Chas' house for a minimum of 26.5 hours while Mr. Cha waited outside for the majority of the time—even to the early hours of the morning. The police refused to allow Mr. Cha to enter his house accompanied by a police officer to retrieve his diabetes medication for four hours. And, as the district court found, none of this delay was "unavoidable"—the officers had probable cause at 1 a.m., and Officer Perez could have drafted the warrant application at least after the 12 p.m. briefing. The officers, however, had a "nonchalant attitude" and proceeded in a "relaxed fashion."

Not only were the police errors deliberate and culpable, they were systemic. Although the officers raided the Chas' prostitution business at 1 a.m. Sunday, the officer tasked with preparing the warrant application was told only to arrive at the police station at noon. The investigating officers were supposed to have their reports completed by 3 p.m., but they did not finish them until 6:30 p.m.; it is unclear whether they knew that the premises had been secured at all. Officer Perez had a "personal preference" to read the reports, so he waited until 6:30 p.m. on Sunday to begin drafting the warrant application. And further delay was occasioned by the Chief Prosecutor, who asked to review the warrant application Monday morning. Finally there was no departmental training or protocol instructing the officers that a warrant must be secured reasonably quickly after a premises has been seized. As far as this record shows, the "nonchalant attitude" that the district court condemned was pervasive in the Guam law enforcement apparatus.

## VI

At oral argument, the United States asked us to remand to the district court to allow the district court to address the *Herring* analysis in the first instance if we concluded that the seizure was unconstitutional. Remand is not appropriate or necessary, however. First, at oral argument, the United States relied on *United States v. Monghur* to argue that remand is necessary. 576 F.3d 1008 (9th Cir. 2009). *Monghur* reversed the district court's conclusion that the police action was constitutional and remanded for application of *Herring*, which had been decided after the district court's opinion. *Id.* at 1013-14. But after oral argument in this case, *Monghur* was amended to vacate the order of suppression *without* remanding for application of *Herring*. 588 F.3d 975 (9th Cir. 2009). Thus, the case on which the United States relies no longer supports its argument.

Second, *Herring* addressed a new question of law—whether the exclusionary rule applies when police officers negligently rely on a database error indicating that an arrest warrant is still valid. Here, however, this court has already concluded that the exclusionary rule is applicable where seizures are unconstitutionally long. *Dass* recognized that exclusion was necessary to deter unreasonable police behavior and to provide for judicial determination of probable cause. 849 F.2d at 416. *Herring* does not require this Circuit to re-analyze and re-balance each category of cases to which it has applied the exclusionary rule over the past decades.

Third, we review de novo the district court's decision to suppress the evidence. The district court made sufficient factual findings to support the legal determination under *Herring* that suppression was warranted and that the police conduct was reckless and systemic. Our conclusion that deliberateness and culpability are legal determinations is supported by the *Herring* decision itself: the Supreme Court applied the district

court's factual findings to determine that suppression was not justified.

Fourth, *Herring* was decided before the magistrate judge issued his report and recommendations. And in its objections to the magistrate judge's report, the United States made a three-page, detailed argument that suppression was inappropriate under *Herring*. The district court reviewed these objections de novo but agreed with the magistrate judge that suppression was the appropriate remedy. Thus, we decline the United States' invitation to remand for further litigation on this issue.

## VII

**[15]** We hold that the 26.5-hour seizure of the Cha residence was unreasonably long and that the district court correctly suppressed the evidence.

**AFFIRMED.**