**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James I. ELKINS and Carol A. Dichtel,**
**Defendants-Appellants.**

**No. 83–5200.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 13, 1984.

Decided April 26, 1984.

---

Lionel R. Barrett, Jr. (argued), Nashville, Tenn., for defendants-appellants.

W. Hickman Ewing, U.S. Atty., Daniel A. Clancy, R. Larry Brown, Asst. U.S. Attys., Memphis, Tenn., (argued), for plaintiff-appellee.

Before LIVELY, Chief Judge, EDWARDS, Circuit Judge, TAYLOR, District Judge.*

ANNA DIGGS TAYLOR, District Judge.

This is a direct appeal from the jury conviction of both appellants on all counts of a five-count indictment on February 15, 1983. Both Elkins and Dichtel were found guilty on count I of aiding and abetting each other to distribute, and count II of distribution, of the controlled substance cocaine, in violation of the 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Elkins was found guilty on counts III and IV, which charged possession with intent to distribute of cocaine and methaqualone, respectively. Dichtel was found guilty of count V, which charged her with assisting Elkins to prevent and hinder his apprehension, in violation of 18 U.S.C. § 3.

For the reasons discussed below, the conviction of appellant Elkins on all relevant counts is affirmed. The Dichtel conviction on count V as an accessory after the fact is affirmed, as well. However, as the district court erred in its denial of her motion for judgment of acquittal for insufficiency of evidence on counts I and II, her conviction on those two counts is reversed.

* Honorable Anna Diggs Taylor, United States District Court for the Eastern District of Michigan, sitting by designation.

## I. FACTS

Charles Keely, the government informant in this case, testified that he had met James Elkins in late 1981 and by November of 1982 had conducted more than ten cocaine transactions with him. Elkins, who had homes in both Fort Lauderdale, Florida and Memphis, Tennessee, would procure the cocaine in Florida and "front" it to Keely: deliver it to him on consignment. Keely would then pay Elkins after selling the substance to Keely's customers.

In August, 1982, however, their business relationship had been disrupted by their arrests during a transaction in which Elkins was delivering a half kilo of cocaine from Florida to Keely in Nashville, Tennessee. After that arrest, Keely became apprehensive of further dealings with Elkins, although Elkins continued to call him, indicating a need to generate enough income to repay his Florida sources for the large quantity of cocaine seized in Nashville. Elkins reminded Keely of the California customers Keely once had mentioned, and asked him to sell cocaine to them for him. Keely, concerned that Elkins had become an informant, arranged through his attorney to become a Drug Enforcement Administration (DEA) informant, himself.

In the presence of DEA Special Agents, Keely called Elkins and indicated that his California customers were prepared to buy ten ounces of cocaine. Elkins had previously told him that ten ounces was the maximum quantity his Florida sources would entrust to him at once, after his large loss. The transaction was scheduled for November 5, 1982, in Memphis.

On November 5, Keely and a group of DEA agents, Shelby County Tennessee Deputy Sheriffs, and local officers, all of whom were participants in the Memphis Metropolitan Narcotics team, met at a Memphis motel room from which Keely called Elkins and advised that his Califor-

nia customer, although prepared to buy, wanted a sample first.

Pursuant to their telephonic arrangements Keely proceeded, accompanied by DEA undercover agent Chapman, after search and under surveillance, to meet Elkins in an industrial district of Memphis and to procure from him a quarter-ounce sample of cocaine. It field tested 94% pure.

Back at the motel room that afternoon, Keely again called Elkins, then put DEA Special Agent Chapman (the "customer from California") on the telephone and they agreed to proceed to Elkins' Memphis residence to consummate a four-ounce purchase. The balance of the ten-ounce buy was to be delivered on the following day.

Keely was again searched and, still under surveillance by the large federal, state and local law enforcement team, he set out to make the four-ounce controlled purchase. He parked in the long driveway of Elkins' home on rural Shelby Drive, but remained in the car and raced the motor to signal his presence, because of his fear of Elkins' large and vicious dogs. After the noise of the racing motor raised the barking of the dogs, Elkins came out. He reached into a red Lincoln Town car parked outside the house, obtained a brown paper bag, and took it to Keely. He told Keely to bring back $9,400. Keely handed the bag over to agent Chapman and was sent home. The four ounces of cocaine in the bag field-tested 94% pure.

DEA Special Agent Thomas Sprague, the agent in charge, radioed DEA Special Agent Buster Griggs to go with Shelby County Deputy Sheriff G.A. Marcom to obtain a search warrant for the house and car. The remaining contingent was ordered to maintain surveillance of the premises and to permit no departures until a search warrant could be executed.

Then, almost immediately, two cars including the red Lincoln Town car from which Elkins had extracted the cocaine drove down the driveway towards the main road, obviously departing the premises. The entire surveillance team of four or five

cars converged upon the driveway to halt and arrest the departing drivers. Griggs and Marcom were delayed for that purpose, as well. It should be noted at this point that all officers participating in this event were aware that, at the time of his Nashville arrest, Elkins had possessed a MACH-10 semi-automatic gun, and silencer.

At least six law enforcement officers and three cars flashing blue lights drove up into the driveway to confront the exiting vehicles and arrested their two drivers. Those persons turned out to be Elkins' teenaged son and one Richard Ackerman. The latter was charged but acquitted in this matter.

Agent-in-charge Sprague then determined that the occupants of the house, obviously still including Elkins, had seen the lights and commotion in the driveway and were probably in the process of destroying evidence. Sprague accordingly directed the surveillance team to surround the house and permit no departures while he and two others knocked, announced, and were admitted, to secure the premises until the arrival of the search warrant. This was at 6:30 p.m., November 5.

As Sprague announced the identity of the officers at the door to the young man who opened it, Carol Dichtel emerged from the rear rooms, asked who they were, and made a hasty retreat upon being advised. The officers were temporarily blocked from moving beyond the front room by two large dogs, which were removed by the young man when he was told they would have to be shot.

While Sprague was still blocked at the front room Officer Hall, moving around the outside of the house, observed Dichtel and Elkins through a bathroom window, each dumping the contents of plastic bags into the commode. He rammed his pistol through the window and ordered them to halt. Although Dichtel did "freeze", Elkins continued to dump.

Inside, Sprague then met Elkins emerging from a bedroom, arrested him, and secured him with the other known occu-

pants in the den while a protective sweep for other persons and weapons was made. Fifteen to twenty firearms were located during that sweep. Three police riot shotguns were found in the living room.

On reaching the bathroom, Sprague found the window broken by Hall's pistol, empty plastic bags containing a residue of white powder, and more powder as well as a number of pills on the floor surrounding the commode, which had just been flushed.

After the protective sweep, all officers and occupants sat in the den together until approximately 8:00 p.m., waiting for the search warrant.

Deputy Sheriff Marcom and Special Agent Griggs had been delayed in their departure for a warrant by the recall to be present when the suspect cars attempted to leave the premises. Captain Joe Holt, of the Memphis Metropolitan Narcotics Division, had ordered Marcom (after Marcom reported the field-test results on the four-ounce purchase) to apply for a search warrant from a Tennessee Court of General Sessions Judge for the Elkins residence on Shelby Drive. The General Sessions Court is not a court of record in Tennessee. Marcom and Griggs called ahead to the home of Judge William Hackett, arrived there around 7:00 p.m., and presented the handwritten affidavit which the two of them prepared on a search warrant form from the General Sessions Court of Shelby County. Deputy Marcom testified that he had been present at the motel with Keely earlier that day, had personal knowledge of the manner in which negotiations by telephone had proceeded, and had seen Keely set out for and return with cocaine under controlled circumstances. He further testified that he and Griggs had not recited all that they knew of Elkins' operations on the affidavit because of their haste. They had only stated the facts they felt necessary to obtain the warrant.

Marcom, who had been obtaining search warrants since 1976, had always been directed by superiors to the General Sessions Court, and had never made such a request of a Tennessee Criminal Court Judge.

Griggs testified that, after Sprague radioed him to go with Marcom, and Marcom had then told him where they were going, he had thought to himself that the case might then be a state prosecution, but he could not recall saying anything.

DEA Agent Lawrence testified that it was routine for the DEA and Memphis Metropolitan Narcotics Division to make cases cooperatively, and to obtain search warrants from General Sessions Judges. Thereafter, whether state or federal prosecutions resulted, members of both agencies have testified. He had never before realized any potential problem or inadequacy connected with a General Sessions Court Search Warrant.

When Marcom and Griggs returned at 8:00 p.m. with the warrant, it was executed by the personnel waiting at the Elkins' residence. Drug paraphernalia, including two sets of scales, a large container of a cocaine dilutant chemical, quaaludes, hashish, a sifter, $2,100 in currency, and certain notes and records were produced.

This prosecution has resulted.

## II. THE WARRANTLESS ENTRY

■ Defendants contend that the initial entry of Sprague and the officers accompanying him to secure the premises was violative of their Fourth Amendment rights. The law is settled that a warrantless entry will be sustained when the circumstances then extant were such as to lead a person of reasonable caution to conclude that evidence of a federal crime would probably be found on the premises and also that such evidence would probably be destroyed within the time necessary to obtain a search warrant. See *United States v. Delguyd*, 542 F.2d 346 (6th Cir.1976), in which we cite *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), and *Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757 (1973), holding that exigent circumstances, requiring police action "now or never" to preserve evidence of crime, permit action without prior judicial approval.

■ In this case, exigent circumstances clearly justified the entry. It was immediately after consummation of a controlled purchase of 94% pure cocaine for a stated price of $9,400 from one well known to the officers as an established interstate cocaine merchant who had the expectation of a larger sale the next morning. The surveillance team had revealed their presence by converging upon the departing automobiles of two guests from the Elkins house and arresting them, with flashing lights and considerable commotion in the rural driveway. Upon discovery that neither person arrested was Elkins, a reasonably cautious person would quickly conclude that Elkins, who was still in the house, had seen the hubbub, realized the situation, and would prudently proceed to dispatch all possible evidence. That evidence would reasonably be expected to include the additional cocaine expected to be sold the next day; the books and records of the enterprise, including indicia of its sources and its customers, and the usual paraphernalia of the industry. Although weapons are always to be expected where substantial drug transactions are conducted, in this case the probability of weapons on the premises was a virtual certainty. The agents knew that at the time of a recent arrest, Elkins had possessed a semi-automatic weapon and silencer.

Accordingly, the warrantless entry was justified by the circumstances. Once having entered the premises, the agents were then required to secure all persons therein and to make a protective sweep for the weapons Elkins was known to favor, for the safety of all concerned. This was done with minimal intrusion, and the agents and occupants waited together in the den from 6:30 to 8:00 p.m. for a search warrant to arrive.

The circumstances precipitating this protective sweep fully satisfy the rule of *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948) that:

> We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.

*See also, United States v. Hatcher*, 680 F.2d 438 (6th Cir.1982), citing *United States v. Coates*, 495 F.2d 160, 165 (D.C. Cir.1974), to effect that courts should be cautious "... in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger."

During their protective sweep of the house, the officers found plastic bags containing methaqualone residue and three methaqualone tablets, in plain view on the bathroom floor. The Supreme Court wrote in *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968):

> It has long been settled that objects falling into the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence. *Ker v. California*, 374 U.S. 23, 42–43 [83 S.Ct. 1623, 1634–1635, 10 L.Ed.2d 726] (1963); *United States v. Lee*, 274 U.S. 559 [47 S.Ct. 746, 71 L.Ed. 1202] (1927); *Hester v. United States*, 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898] (1924).

390 U.S. at 236, 88 S.Ct. at 993.

## III. THE SEARCH WARRANT

Appellants contend here, as they did in the motion to suppress which was denied by the trial court, that the search warrant affidavit was factually insufficient to justify issuance of a warrant; that it did not set forth sufficient basis for authorization of a search for "records, receipts or monies" or for a search of the red Lincoln Town car; and that the warrant was procured in violation of Rule 41(a) of the Federal Rules of Criminal Procedure.

A vial containing cocaine was seized during search of the red Lincoln Town car, after the warrant was obtained. That vial was also received into evidence, and properly so.

■ Independent of the warrant, a search of that car was supported by probable cause and lawful, after the agents observed Elkins come out of his residence, obtain the four ounce bag of cocaine from that car, and hand it to Keely. They next saw another occupant of the house attempt to drive away in that same car. In *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), the Supreme Court held that police officers who have legitimately stopped an auto and who have probable cause to believe that contraband is concealed within it may conduct a warrantless search coextensive with that which a magistrate might authorize.

■ Defendants also argue that, inasmuch as the warrant signed by Judge Hackett of the Tennessee Court of General Sessions fails to satisfy the requirements of Rule 41(a) of the Federal Rules of Criminal Procedure, it is accordingly void, and all evidence seized pursuant thereto was inadmissible.

Rule 41(a) states:

(a) **Authority to Issue Warrant.** A search warrant authorized by this rule may be issued by a federal magistrate *or a judge of a state court of record* within the district wherein the property or person sought is located, upon request of a federal law enforcement officer or an attorney for the government. [emphasis added.]

The Court of General Sessions is not a court of record and this was a federal search, conducted with the cooperation of the state law enforcement officers. Although Judge Wisdom's opinion for the Fifth Circuit in *Navarro v. United States*, 400 F.2d 315 (1968) supports the position that the authority to issue warrants exists only insofar as granted by the rule, and no further, that question need not be addressed on the facts of this case. The results of the search with warrant were not necessary to the sufficiency of the evidence against Elkins, and the evidence against Dichtel was insufficient even with those results, on Counts I and II. Her conviction on Count V for assisting Elkins to prevent

his apprehension is altogether unrelated to the search warrant.

## IV. THE TESTIMONY OF CHARLES KEELY

■ The government's informant, Mr. Keely, testified that he had met Mr. Elkins in late 1981 and by November 5, 1982, had consummated more than ten cocaine transactions with him. Over defendants' continuing objection to evidence of other criminal acts, he was further permitted to testify that Elkins had transported approximately one pound of cocaine from Florida to Nashville on one occasion, and had sustained a loss of $80,000 worth of cocaine in early 1982. Here, appellants contend that the testimony was not only received without a judicial balancing of its probative value against its prejudicial effect, but also that it was received for the very purpose prohibited by Federal Rule of Evidence 404(b); that is, to prove the character of a person in order to show that he acted in conformity therewith. We cannot agree with either contention.

The record is clear that the district judge permitted the evidence of other criminal acts only to demonstrate Elkins' intent in this instance. Moreover, he precluded additional other-acts evidence proferred by the government, because that additional evidence would have been more prejudicial than probative. The balancing test was performed, and the use of the evidence was permissible under Rule 404(b). In *United States v. Largent*, 545 F.2d 1039 (6th Cir. 1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 546 (1977), we sanctioned the use of evidence of prior substantially similar acts, near in time to the offense charged, tending to show a consistent pattern of conduct and establishing intent.

## V. THE DICHTEL MOTION FOR JUDGMENT OF ACQUITTAL

■ There is ample evidence to support the Dichtel conviction on Count V, as an accessory-after-the-fact. She was observed by Agent Hall assisting Elkins in his at-

tempt to destroy evidence, after fleeing from agent Sprague's announcement at the door of the house to join Elkins in the rear quarters.

■ It appears, however, that the trial court's refusal to grant her motion for judgment of acquittal on the substantive counts I and II, of aiding and abetting and distribution, was erroneous, and must be reversed. There is no evidence to take those counts to a jury, as to her. We recently wrote, in *United States v. Tilton,* 714 F.2d 642 (6th Cir.1983), that a challenge on appeal to the sufficiency of the evidence will be determined by review of the evidence in the light most favorable to the government. Then, the conviction will be affirmed if on such review there is sufficient competent evidence on the record to justify a rational juror's conclusion that every element of the offense has been established beyond a reasonable doubt. *Also see, United States v. Wolfenbarger,* 426 F.2d 992 (6th Cir.1970); and *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *reh'g denied,* 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). The evidence upon which the government relies is the clear evidence that she lived with Elkins, both in Fort Lauderdale and at the Memphis residence, and must have been aware of his conduct. The trial court, in denying the motion, pointed to the Keely testimony. As to her, that testimony in its entirety consisted of the following:

Q. How about this other lady over here? Have you seen her?

A. I have seen her.

Q. Tell us how you saw her.

A. I saw her as a girlfriend. That's what I figured she was, his girlfriend. One or two would be with him, sometimes. I used to see her more than any of them.

Q. Out at the house on Shelby Drive?

A. Right.

■ It is noteworthy that Elkins made neither of the cocaine deliveries of this indictment from inside the Shelby Drive house. He made the first from an automobile at a street rendezvous, and extracted the second packet from the red Lincoln Town car parked in his Shelby Drive driveway, then handed it to Keely, outside the house. Dichtel was present on neither occasion. To be found guilty of aiding and abetting a criminal venture, the defendant must be proved beyond reasonable doubt to have associated herself with it, and to have participated in it as in something she wished to bring about; and to have sought by her actions to make it succeed. *Nye and Nissen v. United States,* 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949). There was no evidence whatsoever of such participation by Dichtel in the distributions charged at counts I and II of this indictment.

Moreover, it appears that Dichtel was the victim of improper and heavily prejudicial rebuttal argument by the government, to which her counsel objected promptly and vehemently, but which the trial court refused to correct.

Keep your eye on the ball. For example, here is one of the best questions I heard him ask. I wrote it down. Where are the agents from Ft. Lauderdale to come in and say, we know Carol Dichtel and she has a reputation as a dope dealer? He knows agents can't get on the stand and say that.

Do you remember all the times you all left this room and went back there when we were arguing about who gets to say what? Agents don't get to walk in here and say or did you hear Mr. Lawrence say, I know Ms. Dichtel ... she has a reputation for dope dealing. *Objection by Mr. Barrett.* That is improper argument to imply what went on outside the presence of the jury. I think that is trying to give an impression that he knows is deliberately false. *The Court:* I think he may address the point that was brought up about reputation, but he can't get into what went on outside the presence of the jury. That is true. But I don't think he did. So go ahead, Mr. Clancy. *Mr. Clancy:* Thank you, Your Honor. I don't think I did either.

■ Even responsive rebuttal argument may not be based upon facts not in evidence. *Branch v. Estelle*, 631 F.2d 1229 (5th Cir.1980). In this case, there having been no evidence of Dichtel's having participated in the transactions charged, or even of her presence at the scene thereof, it appears that her conviction has been obtained by the inference that evidence of her guilt had been concealed from the jury. Accordingly, her conviction on counts I and II must be reversed.

The judgment of conviction of Appellant Dichtel on count V is affirmed, however, as is the judgment of conviction of Appellant Elkins on counts I, II, III and IV of the indictment.