NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0641n.06

No. 09-5419

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

*Aug 30, 2011*

LEONARD GREEN, Clerk

PHILLIP MURRAY MODRELL )
)
    Plaintiff-Appellee )
)
v. )
)
JON HAYDEN; MATT CARTER )
)
    Defendants )
)
and )
)
JESSE RIDDLE )
)
    Defendant-Appellant. )
                                 )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

**O P I N I O N**

Before: MOORE and WHITE, Circuit Judges; VARLAN, District Judge.[*]

**HELENE N. WHITE, Circuit Judge.** In this civil-rights action under 42 U.S.C. § 1983,

Defendant Jesse Riddle appeals the district court's denial of his motion for summary judgment on

qualified-immunity grounds. We **AFFIRM**.

## BACKGROUND

We quote the district court's unchallenged factual summary of the case:

On May 30, 2005, an individual reported to the McCracken County Sheriff's Office
that Plaintiff Phillip Murray Modrell's son, Richard Modrell, was delivering

_____

[*]The Honorable Thomas A. Varlan, United States District Judge for the Eastern District of
Tennessee, sitting by designation.

methamphetamine to local convenience stores while on duty as a Domino's Pizza delivery person. Richard Modrell resided at 256 Nickell Heights. On June 7, 2005, Defendant Jon Hayden, a detective for the McCracken County Sheriff's Office, received a call from Bridgette Maxie, an employee of the Kentucky Department of Families and Children, concerning another complaint of illegal drug activity at 256 Nickell Heights. Maxie stated that a caller reported that adults at the residence used methamphetamine and crack cocaine, and that Michelle Lindsey and her fifteen year old daughter used marijuana together in the home. The caller also indicated that there were loaded guns in the house and that adults answered the door with guns in their hands. Pursuant to Maxie's request, Defendant Jesse Riddle, a deputy for the McCracken County Sheriff's Office, accompanied Maxie to the residence on June 8, 2005, so that her office could investigate the complaint.

Upon arrival at 256 Nickell Heights, Riddle knocked on the door and made contact with Plaintiff.[1] Riddle and Maxie informed Plaintiff that they were looking for Lindsey and her daughter. Plaintiff advised them that Lindsey and her daughter lived downstairs and that Riddle and Maxie would need to go around downstairs.

[Riddle returned to his car and drove to the back of the house.] After being joined by another deputy, Riddle knocked on the downstairs door at the rear of the residence. Richard Modrell answered the door and Riddle confirmed with him that Lindsey and her daughter were in the basement. Richard Modrell gave Riddle consent to search the basement residence. The search revealed methamphetamine foils. During the search, Richard Modrell informed officers that he had a firearm in the basement and that his father had firearms in the upstairs portion of the residence.

While in the basement residence Riddle observed that it had a bathroom with bathing facilities and a kitchen. Riddle also observed a carpeted stairwell with a door leading to the upstairs portion of the house. The door had locks on both sides. Riddle did not check the door to determine if it was locked.

After finding the methamphetamine foils, Riddle placed Richard Modrell under arrest [and handcuffed him]. Richard Modrell and Lindsey were both detained by a deputy [in the basement living room]. Riddle then proceeded around the back of the residence and onto the back porch. Riddle informed Plaintiff that drugs had been discovered in the basement and that everyone was being detained while the police secured the entire residence for a search warrant. Plaintiff objected to Riddle's entry

---

[1]Riddle carried with him a digital recorder and microphone, which recorded all of his interactions with the occupants of 256 Nickell Heights. (*See* R. 33, Defs.' Mot. Summ. J., Ex. B [hereinafter Knock & Talk Investigation Tr.].)

into his upstairs residence without a search warrant.[2] Plaintiff states that Riddle told him that he was coming in anyway while simultaneously making a gesture to reach for his side. Plaintiff interpreted this gesture as Riddle reaching for his gun. Defendants state that Riddle requested that all occupants of the residence come outside onto the carport with him, and that Plaintiff indicated that his mother-in-law was not physically capable of doing so and that Plaintiff's grandchild was asleep upstairs.

Defendants state that during this conversation, Riddle observed Lindsey's daughter enter the upstairs portion of the home through the door at the top of the carpeted stairwell that connected the two residences.[3] Defendants state that Riddle then

---

[2]The following exchange occurred when Riddle entered the house:

P. Modrell: You're not coming in without a warrant.

Det. Riddle: Yes, sir. I'm already in your house.

P. Modrell: You're not in my house.

Det. Riddle: I've been in there.

P. Modrell: You're not in my house the upstairs is --

Det. Riddle: Yes, sir. Yes, sir. We're going to come in there.

P. Modrell: I think you're in violation of doing that in my house.

Det. Riddle: I don't think so. Okay. You let me handle that, and you get your attorney. Okay?

P. Modrell: I'm not agreeing to it.

Det. Riddle: -- (Inaudible) come in.

P. Modrell: I'm not agreeing to it.

Det. Riddle: That's fine.

P. Modrell: You're forcing your way in.

Det. Riddle: That's correct.

(Knock & Talk Investigation Tr. 37-38.)

[3]The portion of the transcript that references Lindsey's daughter does not clarify when she came upstairs, and if she was in Ms. Maxie's custody at the time:

P. Modrell: This is not part of the house. That's separate quarters down there.

Det. Riddle: Well, it's part of the house because they've got a stairwell. How did your -- how did this other daughter get upstairs with this female if it ain't part of the house?

P. Modrell: She's been up here since yesterday.

Det. Riddle: Well, she was just downstairs where I was.

      entered the home and remained there until the search warrant arrived. Sometime after Riddle had entered and secured the upstairs area, Hayden arrived and also entered the upstairs residence.

*Modrell v. Hayden*, 636 F. Supp. 2d 545, 549-50 (W.D. Ky. 2009).

      Proceeding *pro se*, Modrell sued Riddle, Hayden, and Deputy Sheriff Matt Carter under 42 U.S.C. § 1983 for violating his rights under the Fourth, Fifth and Fourteenth Amendments of the United States Constitution and committing various state torts. The district court granted summary judgment to Hayden and Carter on Modrell's constitutional claims against them, but held that Riddle was not entitled to qualified immunity from Modrell's Fourth Amendment claims of warrantless entry and his state-law claims of trespass and false-imprisonment.[4] In particular, the court found that, when Riddle entered the residence, the location of Michelle Lindsey's daughter was unclear.

---

      P. Modrell: She just came up the steps.
      Det. Riddle: That's right. And it's part of the house.
      P. Modrell: You mind waiting outside?
      Det. Riddle: No, sir. I'm not going to wait outside.
      Ms. Maxie: (Inaudible) So I can figure out what to do with her.
(Knock & Talk Investigation Tr. 40-41.)

[4]The district court initially granted summary judgment to all defendants on Modrell's Fifth and Fourteenth Amendment claims, but allowed Modrell to pursue his Fourth Amendment claims against Riddle and Hayden for warrantless entry and trespass, as well as one false-imprisonment claim against Riddle. *See Modrell*, 636 F. Supp. 2d at 550 & n.1; *Modrell v. Hayden*, No. 5:06CV-74-R, 2007 WL 2258847, 2007 U.S. Dist. LEXIS 56980 (W.D. Ky. Aug. 3, 2007). Defendants moved to amend this ruling, whereupon the court held that Riddle was entitled to qualified immunity and that Hayden's entry into the residence did not violate the Fourth Amendment. *See Modrell v. Hayden*, No. 5:06CV-74-R, 2008 WL 859273, 2008 U.S. Dist. LEXIS 25185 (W.D. Ky. Mar. 27, 2008). Modrell then filed his own motion to amend. On March 13, 2009, the court reversed itself in part and reinstated the warrantless-entry, trespass and false-arrest claims against Riddle. *See Modrell*, 636 F. Supp. 2d at 561. It is Riddle's appeal of this ruling that is currently before us.

The court held that, depending on the daughter's whereabouts, Riddle's warrantless entry may have been justified to prevent her from destroying evidence of Michelle Lindsey's and Richard Modrell's drug activities.

Riddle filed this timely interlocutory appeal challenging the district court's determination on qualified immunity. After careful review of the record and the parties' briefs, we unanimously agree that oral argument is not necessary. *See* Fed. R. App. P. 34(a)(2)(C); 6th Cir. R. 34(j).

## **DISCUSSION**

This Court's jurisdiction over Riddle's interlocutory appeal arises from 28 U.S.C. § 1291 and the collateral-order doctrine of *Mitchell v. Forsyth*, 472 U.S. 511 (1985), and *Johnson v. Jones*, 515 U.S. 304 (1995). "An order denying qualified immunity is immediately appealable insofar as the appeal raises purely legal, rather than factual, issues." *Booher v. N. Ky. Univ. Bd. of Regents*, 163 F.3d 395, 396 (6th Cir. 1998) (*citing Johnson*, 515 U.S. at 313; *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)); *see also McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010) ("Qualified immunity is a question of law, but 'where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.'" (*quoting Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004))). "[A] defendant seeking to take an interlocutory appeal from the denial of qualified immunity 'should be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the case.'" *Booher*, 163 F.3d at 396 (*quoting Berryman*, 150 F.3d at 564). Accordingly, this Court construes all factual disputes in Modrell's favor.

Government officials may invoke qualified immunity as a defense only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects government officials from liability for objectively reasonable mistakes, regardless whether the error in question is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotation marks and citations omitted); *see also Colvin v. Caruso*, 605 F.3d 282, 291 (6th Cir. 2010). Once a defendant asserts qualified immunity, the plaintiff bears the burden to rebut the defense. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010).

To determine if qualified immunity protects a government official's actions, the United States Supreme Court prescribes a two-step inquiry, which considers: (1) whether the defendant violated a constitutional right; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236; *see also Aldini v. Bodine*, 609 F.3d 858, 863 (6th Cir. 2010).

Riddle maintains that he did not violate Modrell's constitutional rights. In the alternative, he argues that Fourth Amendment law, as it stood at the time of this incident, was not so clearly established that he should reasonably have known that his actions were illegal.

**A.      Whether Riddle Violated Modrell's Constitutional Rights**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A central tenet of Fourth Amendment law is that warrantless government intrusions into a private dwelling are presumptively unreasonable, subject only to certain carefully delineated exceptions. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Katz v. United States*, 389 U.S. 347, 357 (1967); *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010). One such exception exists when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable." *Brigham City*, 547 U.S. at 403 (quotation marks and citation omitted); *Schreiber v. Moe*, 596 F.3d 323, 329 (6th Cir. 2010). The Supreme Court has identified a limited number of cases where warrantless searches or seizures may be justified by exigent circumstances. *See, e.g.*, *Brigham City*, 547 U.S. at 403 (assistance to persons seriously injured or threatened with serious injury); *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (fire on premises); *Chimel v. California*, 395 U.S. 752, 762-63 (1969) (protecting officer safety); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (imminent destruction of vital evidence); *Johnson v. United States*, 333 U.S. 10, 15 (1948) (imminent risk of flight).

Riddle contends that exigent circumstances justified his entry into Modrell's residence in order to ensure officer safety and prevent the destruction of evidence. It is Riddle's burden to prove that such exigent circumstances were present. *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003). This Court reviews the district court's legal conclusions regarding the existence of exigent circumstances *de novo* and its factual findings for clear error. *United States v. Washington*, 573 F.3d

279, 282 (6th Cir. 2009). In doing so, we observe the familiar caveat against using the wisdom of hindsight to second-guess the judgment of reasonable officers on the scene. *Saucier*, 533 U.S. at 205; *Tallman v. Elizabethtown Police Dep't*, 167 F. App'x 459, 467 (6th Cir. 2006).

### 1. Danger to Officers

Riddle argues that securing the entire residence at 256 Nickell Heights was necessary to prevent anyone from shooting at the officers from inside the house. The Supreme Court has long recognized that "[t]he need to protect or preserve life or avoid serious injury" is an exigent circumstance justifying searches or seizures that would otherwise be unconstitutional without a warrant. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (internal quotation marks and citation omitted); *Williams*, 354 F.3d at 505.

Riddle submits that he had information about loaded firearms in the house and that adults carried guns when answering the door. In addition, Richard Modrell confirmed that he had a gun and that his father kept several firearms in the upstairs portion of the residence. Riddle submits that this was sufficient to form a reasonable belief that his safety and that of his fellow officers depended on securing the entire building. In support, he cites *United States v. Elkins*, which involved a controlled drug buy on the defendant's property, a stand-alone house at the end of a long driveway. 732 F.2d 1280, 1283 (6th Cir. 1984). After completing the purchase, officers began proceedings to obtain a search warrant; in the meantime, they continued to survey the house and soon observed two cars leaving the property. *Id.* Officers converged on the driveway with several police vehicles flashing blue lights, but the defendant was not in either car. *Id.* At this point, officers grew worried that the defendant had witnessed the commotion from inside the house and was actively destroying

evidence; they were also aware that, during a prior arrest, the defendant had been carrying a firearm. *Id.* Proceeding without a warrant, officers entered the property, secured the occupants and conducted a protective sweep of the house; then, they waited for the search warrant to arrive before conducting any further search. *Id.* at 1284. On appeal, this Court concluded that exigent circumstances justified the warrantless entry. Specifically, the Court noted that the informant was supposed to return the next day to get more cocaine; therefore, it was reasonable to assume that there were more drugs in the house. *Id.* at 1285. It was similarly reasonable for officers to fear that, having observed the ruckus at the end of his driveway, the defendant would act quickly to get rid of the evidence. *Id.* In fact, one of the officers observed the defendant flushing drugs down a toilet before his arrest. *Id.* at 1283. Finally, the Court noted that the presence of firearms on the premises was "a virtual certainty" in light of the defendant's prior arrest. *Id.* at 1285.

The instant case is substantially different from *Elkins*. When Riddle made his warrantless entry, Richard Modrell and his girlfriend were detained in the basement under police supervision and Richard Modrell's firearm was secured. Furthermore, although the informant's description of 256 Nickell Heights and its occupants was legitimate grounds for concern, Riddle did not see anyone with a weapon at any time. In fact, while Riddle's interactions with the Modrells may not have been outright friendly, they remained courteous throughout the incident. Without a doubt, Modrell was not happy to have the police in his house: he repeatedly denied Riddle permission to enter, questioned the legality of Riddle's actions and tried to reach his attorney by telephone. However, Modrell made no threats, direct or indirect, against Riddle or his fellow officers. Riddle has failed to show that there was an objectively reasonable risk that justified seizing the entire residence.

**2.      Imminent Destruction of Evidence**

Riddle also argues that entering 256 Nickell Heights without a warrant was necessary to prevent relevant evidence from being destroyed. Exigent circumstances may arise when the inevitable delay involved in procuring a search warrant could result in the loss or destruction of contraband or evidence pertaining to a crime. *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973); *Brooks v. Rothe*, 577 F.3d 701, 708 (6th Cir. 2009). In *United States v. Sangineto-Miranda*, this Court explained that a warrantless entry based on imminent destruction of evidence is justified if officers can show: (1) probable cause to enter the residence; and (2) "an objectively reasonable basis for concluding that the loss or destruction of evidence is imminent." 859 F.2d 1501, 1511 n.6, 1512 (6th Cir. 1988) (citation omitted). The second prong is established where officers have reasonable grounds to believe that third parties inside the dwelling "may soon become aware the police are on their trail, so that the destruction of evidence would be in order." *Id.* at 1512 (citations omitted). Since residential searches and seizures without a warrant are presumptively unreasonable, "the police bear a 'heavy burden when attempting to demonstrate an urgent need' that might justify a warrantless entry." *Id.* at 1511 (*quoting Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984)) (other citations and footnote omitted).

Instead of applying *Sangineto-Miranda*, Riddle urges us to follow the Supreme Court's analysis in *Illinois v. McArthur*, 531 U.S. 326 (2001). In *McArthur*, the Supreme Court explained that because the defendant officers had raised a plausible claim of exigent circumstances, "rather than employing a *per se* rule of unreasonableness, we balance the privacy-related and law

enforcement-related concerns to determine if the intrusion was reasonable."[5]  *Id.* at 331 (citations omitted).   To determine whether the plaintiff's privacy interests outweighed law-enforcement concerns, the Court considered:   (1) whether there was "probable cause to believe that [the defendant's residence] contained evidence" of a crime or contraband; (2) whether "the police had good reason to fear that, unless restrained," the defendant would destroy the evidence before they could return with a warrant; (3) whether officers "made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; and (4) whether the restraint in question lasted "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant."  *Id.* at 331-32.

Riddle argues that *McArthur* provides the proper standard for determining the reasonableness of warrantless residential seizures.[6]  However, the four-pronged *McArthur* test did not substantially

---

[5]Riddle argues that, in refusing to apply a "*per se* rule of unreasonableness," *McArthur* effectively abandoned the presumption of unreasonableness that attaches to warrantless residential seizures and lifted the "heavy burden" on the police to justify these actions.  This Court disagrees. To discard the presumption would not only overturn decades of jurisprudence, it would also discard "the very core" of the Fourth Amendment, "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (*quoting Kyllo v. United States*, 533 U.S. 27, 31 (2001)).  Instead, the Supreme Court simply meant that *McArthur* was not an "ordinary case" of unreasonable warrantless seizure, 531 U.S. at 330 (*quoting United States v. Place*, 462 U.S. 696, 701 (1983)), but one that involved "a plausible claim of specially pressing or urgent law enforcement need, *i.e.*, 'exigent circumstances,'" *id.* at 331 (citations omitted).  Thus, even within the confines of the *McArthur* test, the police maintains its "heavy burden" to establish exigent circumstances.

[6]At least one other circuit agrees.  *See United States v. Song Ja Cha*, 597 F.3d 995, 1000 (9th Cir. 2010).

alter the law of this Circuit, as set forth in *Sangineto-Miranda*.[7]  Instead, it simply clarified the

*Sangineto-Miranda* analysis.  In any case, the result is the same under either test.

### a.      Probable Cause to Suspect Presence of Drugs or Other Evidence

The first prong of the analysis – set forth explicitly in *McArthur* and *Sangineto-Miranda* –

considers whether Riddle had probable cause to believe that the upper levels of 256 Nickell Heights

contained evidence of a crime or contraband.  When considering whether probable cause existed to

conduct a particular search or seizure, courts must evaluate the historical facts leading up to the act

in question.  *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *United States v. Moncivais*, 401

F.3d 751, 756 (6th Cir. 2005).  In so doing, appellate courts should "give due weight to inferences

drawn from those facts" by law-enforcement officers, as well as to the trial court's findings regarding

the credibility of these officers and the reasonableness of their inferences.  *Ornelas*, 517 U.S. at 699-

700.  The findings of the district court are reviewed for clear error.  *Id.* at 699.  Once the historical

---

[7]The two prongs of the *Sangineto-Miranda* analysis (probable cause and objective reason to fear destruction of evidence) mirror the first two factors of the *McArthur* test.  The third *McArthur* factor, whether officers made reasonable efforts to reconcile the competing interests of privacy and law enforcement, simply restates one of the basic tenets of Fourth Amendment jurisprudence.  *See, e.g.*, *Pennsylvania. v. Mimms*, 434 U.S. 106, 108-09 (1977) (per curiam) ("The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'  Reasonableness, of course, depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" (*quoting  Terry v. Ohio*, 392 U.S. 1, 19 (1968); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975))).  Finally, analyzing whether the restraint at issue was reasonable in duration is not a new addition to the law of warrantless seizures.  Indeed, the element of duration is implicitly included in the traditional Fourth Amendment requirement to "'examin[e] the totality of the circumstances' to determine whether a search is reasonable." *Samson v. California*, 547 U.S. 843, 848 (2006) (*quoting United States v. Knights*, 534 U.S. 112, 118 (2001)) (alteration in *Samson*).  Thus, *McArthur* simply restates or makes explicit considerations that were already inherent in this Circuit's *Sangineto-Miranda* analysis.

facts are established, the reviewing court must determine *de novo* "whether those facts, viewed by an 'objectively reasonable police officer,' satisfy the legal standard of probable cause." *Moncivais*, 401 F.3d at 756 (*quoting Ornelas*, 517 U.S. at 696). Probable cause exists when "the 'facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent' person to conclude that an individual either had committed or was committing an offense," *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (*quoting Beck v. Ohio*, 379 U.S. 89, 91 (1964)), or that "there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place," *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (*quoting Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

In this case, the existence of probable cause depends on whether 256 Nickell Heights was a single-family home or a duplex. *See Shamaeizadeh v. Cunigan*, 338 F.3d 535, 553 (6th Cir. 2003) ("When the structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to be searched." (*quoting United States v. Whitney*, 633 F.2d 902, 907 (9th Cir. 1980), *cert. denied*, 450 U.S. 1004 (1981))). Under *Shamaeizadeh*, if the house was a single residence, finding drug paraphernalia in the basement gave Riddle probable cause to search the rest of the building. However, if the house was divided into units, separate probable cause was necessary to search or seize the upper floors.

Riddle argues that he reasonably assumed the house to be a single residence because it had only one address and mailbox. It is undisputed that 256 Nickell Heights looked like a single-family dwelling from the outside. However, by the time Riddle entered the upper portion of the residence, he had other information that the house was a duplex. From the start, Modrell consistently

maintained that the basement apartment was a separate unit.[8] Riddle entered the basement from a separate entrance, and when inside, he observed that it had the amenities of an independent apartment, including two bedrooms, a bathroom, bathing facilities, and a kitchen with a refrigerator. Further, Riddle also questioned Richard Modrell, who confirmed that he was renting the basement from his father.[9]

---

[8]Det. Riddle:  Are there some children that live here?
P. Modrell:  My son lives downstairs.
. . .
Det. Riddle:  Okay.  And he has some children, I take it?
P. Modrell:  He has one child.  We've got her upstairs.
Det. Riddle:  Okay.
. . .
Det. Riddle:  [W]here are [Richard Modrell and Michelle Lindsey] at right now?
P. Modrell:  You need to go around downstairs.
Det. Riddle:  Okay.  So they live downstairs?  Okay.  And is that separate from this part here?  Okay.
. . .
Unknown:  Is this a separate house?
Det. Riddle:  Yeah.  That's what he's saying.

(Knock & Talk Investigation Tr. 3-5.)  Whether or not he believed Modrell, Riddle clearly understood references to "upstairs" and "downstairs" to mean that the house was divided into separate units.

[9]R. Modrell:  This is not my home.
Det. Riddle:  Okay.  Who's is it?
R. Modrell:  It's my dad's.
Det. Riddle:  He said you were renting from him and --
R. Modrell:  Yep.
. . .
Det. Riddle:  So do ya'll both live here?
Ms. Lindsey:  Who?
R. Modrell:  Temporary.
Det. Riddle:  And you're renting this from your dad?

Riddle argues that the existence of a carpeted stairwell connecting the basement to the upper floors led him to believe that the house was a single residence. However, Riddle did not verify whether the door at the top of the stairwell was locked; therefore, he could not reasonably presume that the basement's occupants had access to the upper levels, or vice-versa. Further, when Riddle went upstairs to find Modrell after detaining Richard Modrell and Michelle Lindsey, he did not use the stairwell. Instead, he left the basement altogether, walked across the yard and up to the back porch of the house, and met Modrell at the door. Riddle effectively treated the basement as if it was a separate unit without a direct access to the rest of the house.

Reviewing the facts in the light most favorable to Modrell, *Booher*, 163 F.3d at 396, we conclude that an objectively reasonable officer would have understood 256 Nickell Heights to be a duplex with a basement apartment separate and independent from the upper floors. Therefore, in order to justify his warrantless entry, Riddle needed probable cause to believe that someone in the top portion of the house had committed or was committing a crime, or that there was a fair probability of finding evidence of a crime or contraband there. *See Torres-Ramos*, 536 F.3d at 555; *King*, 227 F.3d at 739.

The information that prompted Riddle's investigation came from two anonymous phone calls. The first call reported to the sheriff's department that Richard Modrell was delivering methamphetamine while working as a pizza-delivery man and that there was illegal drug activity at the house. The second call was made to the Kentucky Department of Families and Children and

R. Modrell: Yeah.
(Knock & Talk Investigation Tr. 9, 14.)

expressed concern about the welfare of Michelle Lindsey's daughter. The caller claimed that adults in the residence used methamphetamine and crack cocaine, that Michelle Lindsey and her daughter used marijuana together in the home and that the girl had cut her foot on a broken crack pipe. The person also indicated that there were loaded guns in the house and that adults answered the door carrying firearms. When Riddle arrived at the house, Modrell told him that Richard Modrell, Michelle Lindsey and her daughter lived in the basement apartment and directed him to a separate entrance. Further discussion indicated that Michelle Lindsey had been living with Richard Modrell for two to three weeks and that she was having problems with her husband, whom she claimed to be a drug addict. Richard Modrell agreed to let Riddle search the lower unit, showed Riddle his gun and told him about his father's firearms, but revoked his consent after Riddle found methamphetamine foils in the bedroom Richard Modrell shared with Michelle Lindsey.

The discovery of drug paraphernalia in Richard Modrell and Michelle Lindsey's bedroom corroborated information that they were using drugs, but it was no basis from which to reasonably conclude that Modrell or another upstairs resident had committed a crime, or that there was a fair probability of finding contraband in the rest of the house.[10] Accordingly, Riddle did not have probable cause to enter the top portion of 256 Nickell Heights without a warrant.

---

[10]Riddle conceded as much during his deposition testimony:
Q: What was the exact basis for your suspicion to search the upstairs?
A: *I had no basis to search the upstairs*. We began searching the downstairs of the residence. A search warrant was obtained for the entire residence . . . . We were ordered by a judge to search your residence.

(R. 34, Riddle Dep. 37 (emphasis added).)

**b.** **Risk of Imminent Destruction of Evidence**

We next consider whether there was an objectively reasonable basis for Riddle to conclude that, unless he seized the entire building, someone might attempt to destroy evidence before a search warrant could be procured. *See McArthur*, 531 U.S. at 332; *Sangineto-Miranda*, 859 F.2d at 1512. The district court concluded that there was no reasonable basis for Riddle to believe that Modrell, his wife, his mother, or his grandchild posed any such risk. However, the court found that there was a genuine dispute as to the location of Michelle Lindsey's daughter when Riddle made his warrantless entry. The court held that depending on her whereabouts, and whether she was alone or under Ms. Maxie's supervision, Riddle could have reasonably believed that the daughter might attempt to destroy evidence of her mother's and Richard Modrell's drug activities.

The district court did not err in its determination. Since Michelle Lindsey's daughter resided in the basement apartment and was alleged to have used marijuana with her mother in the home, it was reasonable to fear that, left to herself, she might attempt to destroy relevant evidence. Therefore, the issue of the daughter's whereabouts and supervision present questions of fact relevant to whether Riddle could have reasonably believed that she posed an imminent threat.

**c.** **Reasonable Efforts to Reconcile**

The third *McArthur* factor, which is implicit in *Sangineto-Miranda*, *see supra* note 7, considers whether Riddle made a reasonable effort to reconcile the needs of law enforcement with Modrell's personal-privacy interest. 531 U.S. at 332. Riddle asserts that he did so by asking the occupants of 256 Nickell Heights to exit the residence until a warrant could be procured, and that he only entered the house when they refused to leave.

The Supreme Court has made clear that governmental entry into a private domicile is a substantial intrusion upon the residents' Fourth Amendment rights. *See Payton v. New York*, 445 U.S. 573, 590 (1980) ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."). In *McArthur*, where officers prevented a man from entering his trailer while they obtained a search warrant, the Court opined: "Temporarily keeping a person from entering his home, a consequence whenever police stop a person on the street, is considerably less intrusive than police entry into the home itself in order to make a warrantless arrest or conduct a search." 531 U.S. at 336; *see also Payton*, 445 U.S. at 585 ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (*quoting United States v. U.S. Dist. Ct. for E.D. Mich.*, 407 U.S. 297, 313 (1972))).

Assuming that Riddle initially sought to balance the residents' privacy interests with the needs of law enforcement, any such consideration or equipoise fell away once he entered the upper portion of 256 Nickell Heights without a warrant. When Riddle made his warrantless entry, Richard Modrell and Michelle Lindsey were securely detained in the basement by a deputy, whose presence also mitigated the risk that evidence might be destroyed downstairs. Thus, the officers' law-enforcement needs were met, while minimizing infringement on the privacy interests of the other inhabitants. Any benefit to law enforcement from Riddle's action was marginal at best, but it came at great cost to the privacy rights of the residents upstairs.

Riddle disputes this and argues that, once inside the house, he "only secur[ed], rather than search[ed], the residence, leaving Modrell's home and personal belongings intact." (Riddle Br. 21.) The conversation captured by Riddle's digital recorder belies this assertion and makes clear the extent of his intrusion, which included ordering Modrell to remain in one place and threatening to handcuff him.[11] Riddle has not identified, and this Court cannot discern, any law-enforcement interest that justified encroaching on Modrell's privacy and freedom of movement in this way.

---

[11]P. Modrell:  Do you mind waiting outside?

Det. Riddle:  No, sir.  I can't do that.  Cannot do it.  It wouldn't be considered secure then.

P. Modrell:  So you're in here without --

Det. Riddle:  Yes, sir.  I'm in here with probable cause to obtain a search warrant, and that's what we're doing.  Okay?

P. Modrell:  (Inaudible) -- start digging into anything -- (inaudible)

Det. Riddle:  I assure you we're not going to do that.  That's not the way we handle things.  49, he's going to come downstairs.  Do you copy?  Hang on just --

P. Modrell:  Now you're telling me where I can or can't go in my house.

Det. Riddle:  Well, I can -- (inaudible) with some handcuffs up here if you'd like that, if you don't want to cooperate with me.

P. Modrell:  Have you got me under arrest?

Det. Riddle:  You're being detained, sir.  I've explained that to you more than once.

P. Modrell:  I'm under arrest.

Det. Riddle:  No, sir.  You're being detained --

P. Modrell:  In my own house.

Det. Riddle:  -- while we are securing a search warrant.  Okay.

P. Modrell:  In my own house?

Det. Riddle:  Yes, sir.  You sure are.

P. Modrell:  You telling me I can't walk freely in my own house.

(Knock & Talk Investigation Tr. 49-50.)

### d.     Duration of Seizure

The fourth *McArthur* factor considers whether the length of the seizure was reasonably related to the law-enforcement interest at stake. *Sangineto-Miranda* accounts for this factor as part of its totality-of-the-circumstances analysis, *see supra* note 7. A two- to three-hour delay to procure a search warrant is not *per se* unreasonable. *Compare McArthur*, 531 U.S. at 332 (holding that a two-hour residential seizure was not excessive), *with United States v. Song Ja Cha*, 597 F.3d 995, 1000-01 (9th Cir. 2010) (holding that a seizure lasting over 26 hours was excessive because, in cases involving exigent circumstances, a judicial magistrate could be obtained "at any hour" to sign a warrant). Moreover, there is no indication that the officers dithered or otherwise lacked diligence in filing their warrant application.

In summary, we find that: (1) Riddle lacked probable cause to enter the top portion of 256 Nickell Heights; (2) there is a genuine issue of material fact as to whether Riddle reasonably believed that Michelle Lindsey's daughter posed an imminent threat to the evidence; (3) Riddle's seizure of the entire house privileged law-enforcement concerns at the expense of the residents' privacy interests; and (4) the length of the seizure was not unreasonable. Therefore, whether Riddle violated Modrell's Fourth Amendment rights depends on the whereabouts of Michelle Lindsey's daughter, and whether she was under official supervision, when Riddle made his warrantless entry. This is a question for a jury to resolve.

### B.     Whether Modrell's Constitutional Rights were Clearly Established

Riddle argues that, even if he did violate Modrell's constitutional rights, he is qualifiedly immune from suit because he could not have known that entering the upper portion of 256 Nickell Heights contravened the Fourth Amendment.

An officer is entitled to qualified immunity if the law in existence at the time of the incident did not clearly establish that his conduct would violate the Constitution. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006). "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau*, 543 U.S. at 198. "The relevant inquiry is whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Smoak*, 460 F.3d at 778 (*quoting Saucier*, 533 U.S. at 202). "In inquiring whether a constitutional right is clearly established, we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Champion*, 380 F.3d at 902 (*quoting Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002)). A particular right can be "clearly established" despite the lack of precedent directly on point. Indeed, liability will arise if –

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted); *accord Fisher v. Harden*, 398 F.3d 837, 845 (6th Cir. 2005) ("An action's unlawfulness can be apparent from direct

holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." (*quoting Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003))).

Riddle points out that the district court reversed itself twice before concluding that he could not claim qualified immunity. *See supra* note 4. Riddle argues that, by itself, this shows that the law on this issue is less than clear. However, the district court's hesitation was not prompted by uncertainty over the state of the law, but by concern about a strictly factual issue, *i.e.*, the location of Michelle Lindsey's daughter, and whether Riddle could have reasonably believed that she posed an imminent threat to the evidence. *See Modrell*, 2008 U.S. Dist. LEXIS 25185, at *14; *Modrell*, 636 F. Supp. 2d at 560. On the fundamental principle that, absent exigent circumstances, Riddle's actions violated Modrell's clearly established Fourth Amendment rights, the district court never wavered. *See Modrell*, 2007 U.S. Dist. LEXIS 56980, at *14-15.

Riddle also maintains that this Court's decision in *Elkins* could be interpreted to authorize seizing an entire building when officers fear that occupants may dispose of relevant evidence before a warrant can be secured. However, *Elkins* is too factually dissimilar to reasonably presume its application to this case. In *Elkins*, the warrantless entry occurred moments after a controlled narcotics purchase involving a known drug merchant had taken place on the property, and police reasonably believed that there were more drugs on the premises because the defendant expected to complete a larger sale the next day. 732 F.3d at 1283. In addition, one officer witnessed the defendant and another person actively dumping drugs into a toilet. *Id.* Finally, there was no suggestion that the property in *Elkins* was anything other than a single-family home.

Lastly, Riddle points out that the district court upheld the search of 256 Nickell Heights that took place after the officers obtained their search warrant. Riddle argues that, if it was reasonable for him to believe that the house was a single-family residence when procuring the warrant and conducting the ensuing search, then it was no less reasonable for him to believe that he could enter the upper level without a warrant based on exigent circumstances. This interlocutory appeal deals solely with Riddle's warrantless entry, however, and we express no opinion as to the legality of the subsequent search.

## CONCLUSION

The ruling of the district court is **AFFIRMED**.